My name is Sandy Svetkov from San Francisco by way of Brooklyn, New York, originally. And I represent the Appellants and Municipal Employees Retirement System. Your Honor, I'd like to reserve five minutes of my time for rebuttal. That's fine. Looking at your calendar, this appears to be the Super Bowl of securities cases this morning. And I guess I'd like to start off by saying that the Private Securities Litigation Reform Act certainly raised the bar on our pleading, but it did not close the courthouse to securities cases. The Employees' Retirement System is here this morning to challenge the dismissal of their First Amendment complaint. It's our submission that the District Court reversibly erred under TELABS and under this Court's decision in Dow and Oracle in holding that the plaintiffs did not plead a strong inference, that the defendants had actual knowledge that their forecasts were false. This is essentially a forecast case, but there are also statements of current and historical fact which become important in analyzing the safe harbor issue when we get to it later. The District Court erred under TELABS by ruling first that the plaintiffs relied exclusively on confidential witnesses. Surely we did rely on confidential witnesses, but there was a lot more than confidential witnesses in this case. For example, confidential witness number five, who was a retail sales manager, said that orders were placed at Sketchers four months in advance. Well, guess what? So did President Michael Greenberg of the company. So there is admission on some of what the and corroboration of what the witnesses said. The district judge paid no attention to that. He said that the witnesses' reports were conclusory and then never went on to discuss them witness by witness or any way point out how they were conclusory. They were not conclusory. If you look at CW8, he said in paragraph 64 of the complaint at excerpt of record 87 and 88 that he attended a sales conference in February of 2002 in Las Vegas, in which all of the defendants were present. And he said that the vice president of sales said to the group, including the defendants, look, our sales for the second, third and fourth quarter of this year are declining seriously. And that was corroborated by another witness, CW4, who said sales were declining in the range of 30 percent after 9-11 and by the end of 2001 by 50 percent. And contrary to Judge Anderson's statement that no customers were identified, CW8 named the customers. He named Kohl's. He named Famous Footwear. He named Finish Line. He named Shoe Carnival. And by the way, CW15 corroborated that and named some of those same customers and said that he sent the sales reports that had been accumulated in preparation for that conference to the defendants, describing this decline in the sales. And guess what? At the end of the process, sales went down amazingly. Instead of they opened with a forecast of $1.59 per share. In April they raised that to $1.69 a share. In July they raised that to $1.73 a share. And then, oops, when the bad news started to come out, they started ratcheting it down. They ratcheted down to $1.40 something in September and $1.41 in October. When it came to December 9th, it was $1.14. That's a huge miss. That actually is the 30 percent miss that the witnesses were talking about at the front end. So it fits together. The reports of the witnesses, the facts on the ground, the performance of the company, and this scheme was an elaborate scheme. They knew what was about to happen, so they tried to save it. Now, it's very important you hold on to the idea that they know four months in advance of shipment and that the orders are placed or not. Let me ask you this question. Sure. If you abstracted or took away the two confidential witnesses, would you have a sufficient link between what happened in February and the April statements? Or, in other words, are you dependent upon the two confidential witnesses to be able to establish that linkage? Yeah. Your Honor, I wouldn't unravel this. TELAPP says you've got to look at this collectively, and I need all of the facts here to make my case. So you do need the two confidential witnesses. Yes. But not my case is not exclusively based on those witnesses. There's more to this than that. I understand that. But if we could focus on the two confidential witnesses. Sure. Maybe you can clarify for me whether there really was sufficient identification of who these people were and whether or not there was a sufficient allegation of how these confidential witnesses learned of the reports, who drafted them, which offices received them, and an adequate description of their contents. It seems to me that that basically is what we have to focus on. Right, Judge. And I think that let's take CW8, for example. He was a regional sales manager. His report says that he attended the conference at which the vice president of sales, who was identified by name, Joe Phillips, made a presentation to all of the sales managers and sales representatives and the defendants. They were all there. And he described what Vice President Phillips said, and that was that sales were down, were going to be down for the second, third, and fourth quarter based on the sales reports that had been developed for the conference. CW15, who was a sales representative, said that sales reports were prepared for that conference and that they were distributed to the defendants in advance and showed the trend in sales at that time. But did you set forth what the contents of those reports were through the eyes of the confidential witnesses? Not precisely, no, Judge Block. We don't have that. And in these securities cases, we're not going to have everything. Lots of this information is within the bowels of the company, and we're not going to get it until discovery. How does TELEBS interface with the absence of that specific information? I think it interfaces in this way. It says to your honors, look at the entire mosaic of facts that the plaintiffs are able to plead. And does that say that this is a sham case that should not pass under the PSLRA, or is it a case of substance that deserves going forward? I have to apologize to all of your honors, because in writing the briefs, I missed a very significant fact that I found as I was rewriting the record in the briefs. If you would turn to page 88 of the excerpts of record, in the last sentence of paragraph 64, CW8 said the following. CW8 further identified that Sketchers made a videotape recording of the National Sales Meeting's presentations. Now, why is that important? Why would a witness fib about something if he is willing to step up and say they took videos of all of this stuff? So if he's off mark, it's all on tape. And that goes to the tension, if you will, between the defendant's reliance on the Seventh Circuit's recent decision in Higginbotham and all of the other circuits, including the Dow and Oracle case in this circuit, the Novak decision in the second, and the ABC arbitrage in the fifth, and on down the line, Adams v. Kinder in the tenth. You look at the witnesses not with a skeptical eye and discount them the way Judge Higginbotham did, as if all plaintiffs would just make up any allegations willy-nilly, or you look at the coherence of the complaint and say, is what the plaintiffs have put before us a plausible case that meets the standard of a cogent and compelling showing as likely as any contrary evidence? So in light of tele-abs, where did the district court go wrong here? Well, the district court did not, did not analyze the allegations collectively. He said we relied exclusively on witnesses, which is not correct. We don't rely exclusively on witnesses. He said the witnesses were conclusory and vague, and the witnesses were quite specific. They identified customers, they identified the amounts by which sales had been reduced. What they said was confirmed by what ultimately occurred in the production. My friends will call that fraud by hindsight. Fraud by hindsight is not always a bad thing. Judge Jones in the Fifth Circuit recognized in the Plotkin case and the Second Circuit in Scholastic recognized that what happens after the fact can often provide inferences about what happens during the class period. So, too, events prior to the class period can inform what's going on in the class period. The fact that some of the witnesses, most of the witnesses were present at Sketchers during the class period. A few left just before. But just before doesn't matter in this case, because four months before the class period is the relevant time when orders are being placed with this company. Now, before Judge Block asked me the question, I was about to describe a second link between these heroic forecasts that threw the public off and another fib that was used as part of the scheme. Let me, before you get on to the second link, I'm not finished with the first link here. All right. Basically, you're saying that the district court did not have the benefit of tele-abs and considered these individually rather than collectively, all of your concerns, right? So what do you recommend, if we were to agree with that, that the matter be remanded to the district court to reconsider this case in light of tele-abs, or we can do it? I can't tell you how happy I am you asked that question, Judge Block. The Ninth Circuit had a tougher standard than tele-abs. In Gomper v. Vizics, which I'm painfully aware of because I argued and lost that case in this circuit, I argued that ties go to the plaintiff. That when the inferences of scienter are as plausible as those to the contrary, the plaintiff wins on the ties. In the Ninth Circuit in Gomper, the test was the most plausible of inferences. If we didn't have the most plausible of inferences, we lost, and that was the test that Judge Anderson applied. So we have a more relaxed standard, in a way, in tele-abs as compared to what we had before. But Gomper's had another piece to it, which tele-abs ratified, and that is you compare the inferences. You can consider adverse inferences in the Ninth Circuit. You could do that before tele-abs. So tele-abs changes the law, it confirms part of the law of the Ninth Circuit in Gomper that you can consider adverse inferences. It confirms that Gomper recognized you had to consider the entire complaint collectively. Tele-abs ratified that, so in that respect the law is the same. But what it changed was it relaxed the standard in terms of comparing it. We don't have to show the inferences of scienter are more plausible until trial. In other words, the more probable than not, more plausible than not standard is a trial standard. If there's equipoise, if the inferences of scienter are as compelling and as strong and as likely as those any suggested contrary inferences, the case goes forward to discovery. So you say that it's not for us under a de novo review to make that determination? It is for you to make that determination. You should rule that under Gomper and tele-abs and Dow and Oracle the judge erred as a matter of law, and that this complaint can go forward. That's what you should do in this case. It strikes me that it's not in the interest of judicial economy to rewrite the law, send it back to the district court and have him fix it. He had the guts of the law in Gomper that we have in tele-abs to send it back now where the standard, the only change in the standard is we don't have to show the most plausible. Seems to me to be not a good use of judicial resources. If he gets it wrong the second time, we'll be back. It doesn't make sense. You should decide it as a matter of law. That's what de novo review, I think, entitles you to do, and I think this case has been kicking around long enough in that regard. Now, let me see if I can get that other link in, which I've been off. To cover up the fact that the second quarter... Why is that material? Well, there's nothing wrong with shifting the sales. What's wrong with it is the explanation given. Shifting the sales is perfectly all right, but they said it was requested by their customers, and that it, in fact, what was happening, it was an orchestrated scheme that went back to the February conference in which they decided to offer price concessions and turn the sales over to the district court. And six witnesses, six witnesses interlink, identifying the customers like Macy's who accepted early shipment, confirming that none of these customers requested it, confirming that they were told to offer the concessions. I guess I'm having a hard time understanding. Let's assume all this was done intentionally with all these purposes in mind. But what difference did it make? Why was it material to the health of the company? Whether it was the second quarter or the third quarter, what difference does it make? It concealed the fact that the overstated forecasts were not correct. It showed knowledge of the fact that the performance of the company was going down, and by robbing the third quarter to fix the second, they delayed the recovery. It's part of the fraudulent scheme concealing the fact that the forecasts were failing. It's the underpinning of the improper forecast scheme. I think I'm into my time. If you want to save some time, Mr. Secco. Good morning, Your Honors. May it please the Court, my name is Seth Aronson from O'Melveny & Myers. I'm here today for the defendants. This case primarily involves forward-looking statements. It's not a case of bad accounting. It's not a case of revenue recognition. It's not a case of any funny business going on at the company. It's whether or not two sets of projections were false when made and that they were knowingly false when made. When we have forward-looking statements, it brings into play the safe harbor of the Reform Act. And the safe harbor has two very important prongs to it. Now, Congress put the safe harbor there because Congress encouraged companies, encouraged businesses to make projections. Let the investors know what your plans are. Let us know. And the company said, if we're wrong, we're going to get sued. Congress said, no worries. If you make projections that are either accompanied by meaningful cautionary statements, you'll be okay. And even if you don't have... What does the Congress mean to say that even if you intentionally and falsely and fraudulently made statements, you're still entitled to the safe harbor protection? Congress didn't address that, but I'm not arguing that, Your Honor. Congress. I just was wondering what the full length of the Congressional Act constitutes. To me, if it's fraudulent, intentionally made, falsely made, and you know it's false at the time, it's not a meaningful cautionary statement. To me, it doesn't apply. But they have no evidence of that. There's nothing in the record. The second prong of the safe harbor says that even if you don't give the cautionary warning, the plaintiff has to plead actual knowledge of the falsity. And the district court here looked at those, looked at the projections and said, number one, they were accompanied by meaningful cautionary language. District court did not simply rely upon the confidential witnesses. The district court looked at the warnings, looked at the SEC filings, looked at the documents incorporated by reference, the exact things that TELLAB says the court should do, and said, these are meaningful. These laid out the exact risks. What was the statement here exactly? The April, what was it, the April press release? What was the statement? The statement were the projections of the company. What was the statement? The statement. What did he say? It says, going forward, let's see. Excuse me one moment. What did they allege that he said? They allege that the forecasts that were given by the company for. Did they attribute any particular remarks to what he said? Yes, it's in the company's press release. And what were the words? The company's press release was that going forward, we believe that our earnings per share for a year end, and they gave what the number was for the earnings per share. And what were the cautionary remarks? The cautionary remarks were throughout these statements, throughout the SEC filings, Your Honor. The cautionary statements were particularly tied to. So you have to read the whole package. You have to read the whole package, and Judge Anderson did read the whole package when he ruled. The plaintiffs also, though, even if you don't believe that the statements were meaningful and cautionary, which Judge Anderson found they were, then you have to look and see whether or not there was actual knowledge of the falsity at the time they were made. We'll get to that in a moment. It's very important that there are, the Reform Act also set forth two prongs for the pleading standard that Mr. Svetkov said raised the bar. Let me ask you this. You know, I used to say when I first started this job that, you know, pardon me for interrupting you, but now I realize that I do mean to interrupt you. The question of determining whether these cautionary statements under the safe harbor are meaningful or reasonable, et cetera, when is that an issue of law for a court to decide as compared to when it should be a jury determination? Usually reasonableness is something which is fact-laden, isn't it? The Reform Act says that the determination shall be made on a motion to dismiss. Has to be made. So it's never a question for jury determination. It could be, but it's still not. When? It could be if the plaintiffs are able to show, if they're able to convince the Court that these statements were not meaningful. I think it would be a rare instance, Your Honor, but it is a threshold question, and Congress said we want to decide these issues at the threshold. But at that point, Your Honor, the Court, for example, could find that the defendants intentionally knew they were false at the time they were made, that they were not cautionary. But the Reform Act gave the plaintiffs, they have two requirements now that are different from every other case. And the Ninth Circuit has said the securities cases are an unusual deviation from the usually lenient requirements of federal rules of pleading. Number one, they have to state their case with particularity, the fraud with particularity, and the basis for why the statements were false when made. And secondly, and more importantly and directly applicable here, is they must state with particularity facts giving rise to a strong inference that the actor, acted with the required state of mind. Here, that's actual knowledge. The test is not whether or not it's a sham complaint. The test is whether or not they meet the strong inference requirement. I don't understand. And we know what the forward-looking language is, and we know what the statements are under the safe harbor principles. What else is there for us to ascertain? The Court can review the district court written opinion and look and see whether or not it agrees that the statements that were made were meaningful and cautionary and directly lined up with what happens here. And we have to also be satisfied that the statements are false, I guess, right? Right. And false at the time of the evidence of falsity here? Zero. There is no fault. What they have to prove is not that there's a sales meeting in February in which someone said go out there and sell more shoes. What they have to show is that when the April statement was made and when the July statement was made, that those projections were false, and that the plaintiffs or that the defendants knew they were false, that they either had a set of false projections and real projections or some document or corroboration that says at the time those statements were made, they were false. They have none of that. None of their confidentiality. So that's what you believe is fatal to their case? Absolutely. There's not one witness, and we'll go through their witnesses, but not one witness says when they made those statements, they knew they were false, and here's why. So do you pin your argument on the safe harbor? I'm sorry? So do you rely primarily on the safe harbor? Absolutely, Your Honor. We do, because they don't show, as the court pointed out, these are meaningful cautionary statements. Our sales are dependent upon back-to-school sales and holiday selling, that this is a fashion item that is subject to different consumer preferences. In A, they're not false, and B, if they were false, it comes under the umbrella of the safe harbor. Correct, because there's no allegation that anyone knew they were false at the time they were made. That is critical here. They have no particularized factual allegations to that effect, no internal reports, no conflicting projections. Not one witness says, you know, when they said that, when they gave those EPS projections in April, he knew it wasn't false, or he knew it wasn't true. They have none of that. They have a sales meeting in February, in which a salesperson tells the sales group, go out there and sell more shoes. The trend is coming down. Sell more shoes. That's not fraud. They went out and they sold more shoes. Whether they gave customer discounts, that doesn't matter. That happens in business all the time. Go out there and sell more shoes. And you know what happened after that February sales meeting in Las Vegas, that they've got all these witnesses who attended? The company exceeded its projections for that second quarter. Exceeded them. That's not what they're suing on here. They're suing in the third and fourth quarter. So in February, when the sales people say, the vice president of sales says, go out there and sell more shoes, you're not doing your job, they go out there and sell more shoes and exceed the earlier projections. That's fatal to their case as well. And as the district court said, there's no connection between what happened in Las Vegas in February and a statement that was made in April or in July. That, too, is fatal to their case. The specific warnings here dealt with fluctuating consumer demand, the significance of the back-to-school sales, and the holiday selling season. Do you think it's possible for a plaintiff to ever satisfy the pleading demands, the requirements of the private securities litigation? Of course they can, Your Honor. I mean, I read this complaint very carefully, and I actually thought it was pretty good. I mean, I had a really hard time digesting your argument as to why it failed. Well, Your Honor, we have the safe harbor, and the safe harbor dictates that. I only speak for myself. I'm not quite so sure. Well, when the company says that we're dependent upon the new act, it put a very tough burden on the plaintiffs, but it didn't make it an impossible burden. It's not impossible. You don't get that feel from the Supreme Court's decision in Telenet, but at least I didn't when I read it. Of course not. It's not impossible. If they had someone who could say, not that there was a salesman. The district court did here was go through each allegation and sort of like divide and conquer. Rather than taking a kind of a holistic mosaic, to use the word that Mr. Setkoff used, in evaluating this complaint. Right, but what is. Well, the court addressed the issues that is, you know, and I thought went through in a very careful way. If they had anything close to a witness or a document or a suggestion or a hint, that the projections were knowingly false at the time they were made, then we might have something. But they don't have anything that approaches that, Your Honor. I don't think the confidential witnesses help them on that. And just so that we're clear, we're not arguing that they have not identified their confidential witness with particularity. That's the first prong that I mentioned. They're particular facts. What we argue is that there is no basis to say that those confidential witnesses were in a position to know what the plaintiffs alleged. They were not in a position to know that the statements were false when made. How big is Sketchers? How many employees is Sketchers? It has thousands of employees. It's in a very... Around the country? Around the world. They're based here in Los Angeles. They have operations around the world. They deal in a very competitive market. We've laid out who their competitors are. It's laid out in their SEC disclosures. They depend upon people's fashion tastes and how one can be sued for fraud for failing to predict how youth, and this is youth because it's back to school, that's who goes to school, how those people, how those youths are going to prefer Sketchers brand to another brand cannot be fraud when you make a statement that says here's what we think our projections are going to be going forward. There's nothing to show... That fashion industry is exempt. It's not exempt, but investors know when they're investing in a fashion company stock that fashion tastes change. That's what investors know. Investors can gamble on that. And they can say, you know what, we think they've got a good brand. Maybe Nike's got a good brand. Maybe we'll invest in Nike. Maybe we'll invest in Adidas. Maybe we'll invest somewhere else because we think they've got a better brand. But let's look at their confidential witnesses. They talk about confidential witness number eight. We spoke about he was the one at the Las Vegas sales conference. Does not say that the projections were false when made, and in fact, after that Las Vegas sales conference, the company exceeded the estimates. Confidential witness 15 didn't even work at the company during the class period. He or she was obviously in no position at all to know whether or not when the projections were made they were false at the time. They were made. We have other confidential witnesses who work during some unspecified time during the class period. None of them can give rise to the strong inference required by teleps. That's where there's a disconnect. They could. The teleps case says there is a way to plead this. If you plead a plausible and cogent inference, you'll survive. But it wasn't even close here. And whether or not the Gomper case said that the tie goes to the plaintiff or, I'm sorry, the tie goes to the defendant and teleps now says that the tie goes to the plaintiff, it doesn't matter. As two of the concurring opinions in teleps point out, that's theoretical. When you're weighing different inferences, it's almost, it's theoretical that they would be inequipoise. To follow up on Judge Block's question, should, since the district court did not have the benefit of teleps, since the district court kind of looked at these allegations individually, should the district court be given another opportunity to reevaluate the complaint? Your Honor, if there was a close call, I would agree with you. But this is not a close call. And the district court did not think it was a close call. And we know that these are the best facts that the plaintiffs have. Because they were granted leave to amend, and they refused. They said, by implication, these are the best facts we have. It doesn't get any better for us. Otherwise, they would have taken the district court's offer to amend their complaint. They said, nope, we're coming straight to the Ninth Circuit. The court did go through the teleps analysis. It didn't say it was close. It didn't say there's a tie that now goes to the defendants. It looked at all of these confidential witnesses and said, they are not in a position to know. Whether or not someone is a vice president in retail says nothing about wholesale. They have one witness who says that two shoe lines, the Energy and Retro, they were able to identify those, were having disappointing trends, and this was confirmed back in February at the Las Vegas sales conference. Sketchers has 1,000 lines of shoes. The fact that two might have been lagging does not give rise to a strong inference of fraud. It simply cannot. Finally, Your Honor, the shift of the $20 million from the third quarter into the second quarter is, quite frankly, a red herring. This was fully disclosed. When the company came out with its results, it said, we had better results this quarter because of the $20 million that were slated to be delivered in the third quarter, and now we take them in the second quarter. Background for this, again, fully disclosed in the holistic record is that that summer there was a threatened and then, in fact, a court strike. Customers might want early deliveries. There's no allegation these were not legitimate sales. This is not a channel-stuffing allegation where you send things out early and you know they're going to come back, but you make your quarter and you rob Peter to pay Paul. None of that. And the fact that the customers are able to take early delivery helps the company, because now that you've got the product on the store shelves, customers hopefully are buying them and then reordering them. That's a good trend. That's what businesses do. And there's no allegation at all that there was any scheme that this $20 million in the summer that was fully disclosed was part of a scheme to defraud that went back to a February sales meeting that they videotaped. Why on earth would they videotape their so-called scheme? There's absolutely nothing wrong with selling as many shoes as you can. That's what the company does. That's what the shareholders want. Go out there and sell more shoes, and that's what they did. And whether or not the implication, as Judge Block pointed out, as to who requested the early delivery is of no moment. They were accepted. It's very difficult in a conversation that salespeople have with their customers all the time about who initiates the prospect to make the sale, make the delivery. But even if it was initiated by the company, that still shows demand for the product. If there was no demand for the product... You know, I don't think, Mr. Aronson, that he's going to argue otherwise. He's not suggesting anything other than they said something factual that isn't true. I think that's what he's relying on. And his point is, that cannot be disputed. Now, can it be disputed? Well, the fact that he says that it's false is that the company said that this shows heightened demand for our product. And from that he says, well, you imply from that that the customers asked for the early delivery instead of the company. The fact that the early shipments were accepted by the customers and not returned, to me, shows demand from the customer. So that statement is not a false statement. It does show demand because it was accepted, regardless of who initiates it, regardless of whether or not a salesman picks up the phone and says, you know, you've got some orders that are due next month, how would you like to take them this month? There's a strike coming up. Good idea. Ship them now. We'll pay for them. And that shows earlier demand. It shows increased demand. It's not a false statement, especially with a looming port strike. And again, they have to show a compelling inference that that was fraudulent. And it's neither compelling nor plausible or cogent, as Taleb says. Taleb didn't change what this court, what the district court did. It changed a little bit. It changed a little bit in that rare case where some court, and I've never seen this case, where the court says, this is an absolute tie. It's a statistical tie. And we're going to give that tie to the defendant because the Gomper panel said that's what we should do. I've never seen that case in any of the cases, either in the Ninth Circuit or around the country. This judge did not find that it was a close call. This court should look at these facts and say, this is not a close call. Mr. Jones, and just in this last minute you've got, summarize your best and strongest position for affirmance. The best and strongest position is this, Your Honor. These are forward-looking statements. They are protected by the statutory safe harbor that Congress put in place. And there's no allegation that those statements were knowingly false at the time they were made. Nothing, not a scintilla of evidence, no suggestion or hint. They have to piece things together from a February sales conference that said nothing about projections. They have to look at the projections at the time they were made and come up with some corroborating allegation. They have zero on that. They've got a lot of confidential witnesses who work in the warehouse who would never know whether or not the projections were false when made. They have people working in the retail division. How would that person know that these were false when made? If they had someone who was at the company who said, you know what, they made those projections, I know they had contrary projections in their possession, and that would be a case in which the plaintiffs would prevail. We don't have that here. We have nothing like that. All we have is innuendo, and it is not cogent or compelling. Thank you. Thank you, Mr. Aronson. I think we should go back to first principles. The entire argument that Mr. Aronson made is based on the demand for direct evidence. He wants someone to step up and say to you, sketchers knew it was false. That forgets what the Supreme Court said in Huddleston 25 years ago. Circumstantial evidence is the way you plead fraud. You don't have confessions. You don't have inside witnesses saying we sat around, I'm the vice president, I sat around the boardroom and all those guys knew it. What we have is a series of witnesses who were in key places, and who said that the defendants were told about the declining sales. Then we have a pattern of conduct by the defendants. And by the way, Mr. Aronson said this company has thousands of employees. It has 1,100 total full-time employees, excerpt of record 146. This is a closely held family corporation. President Greenberg, CEO Greenberg, vice president Greenberg, CFO Weinberg. Four guys ran the company. And by the way, shortly after they raised the forecast from $1.59 to $1.69, guess what they did? They sold $33.6 million worth of stock. That counts in the Sienter equation. Now let's talk about this big deal safe harbor point, which I didn't get a chance to look at. It doesn't judge Ferris, but you know the record. The record says that they sold 1.5 million shares. They sold 1.5 million shares during the class period at prices of $20 to $22 a share. Prior to the class period, one guy sold 900,000 of his shares for $3.1 million. So the price was a lot lower. It makes a difference that you inflate the stock and sell high as compared to selling only 40 or 50% of that amount in the previous period. And during the class period, they sold 95% of the stock they were permitted to sell under SEC law. And one of the folks sold at $11.5 just weeks before the stock crashed to $7. There's great insider timing here, there's coordination of sales, and it all fits together with the other facts. I want to spend the last two minutes on this safe harbor. In these press releases, they list a bunch of risks, and they say if any of these risks occur, our earnings might be lower. One of the risks they list is if our back-to-school sales are lower, it might affect our earnings. The problem with that statement is when you're told at a sales meeting that your sales are declining, you have no business increasing your projections. And then worse yet, their current statements serve to dilute, if not to drown out, the warnings. Look what they said. I know that we will exceed our sales levels. We have increased sales plans received from a number of our largest accounts. We are very well positioned for back-to-school selling. They said things that counteracted the safe harbor warning in a way that influenced the analysts, who stated in their analyst reports that management has said that they're getting more sales from their largest customers. But the witnesses are saying that the customers are reducing their sales, or taking price concessions to pull in earlier. What do the price concessions do? They cut into earnings, because you can't make as much profit. It does fit together, contrary to counsel's view, that this was a pattern of fraud in which all of these pieces were designed to do one thing, which was to delay the revelation of the problems that the company was having. And in that delay, the defendants made money and cushioned their losses. The plaintiffs, who paid the high price during the class period, suffered the fall to $7. Thank you. Thank you, Mr. Coffey. Time is up. We appreciate the arguments in this case. Very helpful. The matter will be submitted.
judges: Farris, Paez, Block